UNITED STATES of America,
Plaintiff-Appellee,

v.

Reuben KRASN, Defendant-Appellant.

No. 78–2950.

United States Court of Appeals,
Ninth Circuit.

March 10, 1980.

Stephen D. Miller, Beverly Hills, Cal., on brief, David D. Hinden, Miller, Glassman & Browning, Beverly Hills, Cal., argued, for defendant-appellant.

Frederic Freilicher, U. S. Dept. of Justice, Washington, D. C., argued, John J. Powers, III, Washington, D. C., on brief, for plaintiff-appellee.

Before CHOY, ANDERSON and HUG, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

This is a criminal antitrust case. Krasn, the defendant below and the appellant in this court, thirteen meat-packing corporations, nine individuals, and one trade association, were charged with a conspiracy to fix, raise, and stabilize the price of carcass beef in the Los Angeles area. Krasn was the only defendant who proceeded to trial. After an eleven-day jury trial, Krasn was found guilty on one count of violating Sherman Act Section One. He then took this appeal, raising five assignments of error. Krasn claims that his conviction should be reversed because of: (1) the government's breach of a plea bargain agreement; (2) the pre-indictment delay; (3) the instructions on conspiracy; (4) insufficient evidence of the effect of the conspiracy on prices; and (5) the introduction of summary charts into evidence. After a thorough review of the record and Krasn's arguments, we conclude that there was no reversible error and affirm his conviction.

## I. FACTS

What follows is a brief description of the background of the conspiracy. Other factual matters are discussed as they become necessary to our consideration of the arguments raised by Krasn.

Krasn was the president of Globe Packing Company. His company, along with the other original defendants, was a member of Meat Packers, Inc., a nonprofit trade association for meat packers (referred to as trade association).

In the 1960's, the members began to have weekly meetings every Wednesday morning at the trade association offices. Various matters were discussed, but the meetings generally focused on the price at which they would sell their carcass beef.

Safeway, the largest purchaser of beef in the area, made its weekly purchase of beef on Wednesdays. The meat packers submitted telephone bids to Safeway up to 11:30 a. m. on Wednesdays. Safeway would then announce its purchases later in the day. The Safeway price set the standard which was followed by other retailers as the fair market price for carcass beef during the following week.

At the Wednesday morning meetings the packers would discuss and arrive at a consensus price for their bids to Safeway. There was some dispute as to how binding the consensus price was to the packers, but nonetheless an agreement would be reached.

The Wednesday morning meetings and the packers' discussions about the Safeway price were interrupted by the nationwide price freeze which began on March 29, 1973. During this time the packers initially were forced to close down because of the ceiling on their prices which did not consider the rising cost of livestock to them. The retailers then began purchasing the livestock and contracting with the packers to have them custom slaughtered for them.

Following the end of the price freeze in February of 1974, the Wednesday morning meetings were resumed. The government stipulated that the conspiracy covered in the indictment did not continue after August of 1974. Krasn was eventually indicted for price fixing. The present appeal is taken from his conviction for violating the Sherman Act.[1]

## II. *DISCUSSION*

### 1. *The Plea Bargain*

Krasn plead guilty to other criminal charges which also arose from the same investigation of the Los Angeles meat packing industry as the present antitrust charge. Krasn argues that the plea bargain which was negotiated on the other charges was supposed to include all other possible criminal charges. After an evidentiary hearing, the district court rejected Krasn's argument.

On March 27, 1974, Krasn was indicted for the bribery of a U. S. Department of Agriculture meat grader in violation of 18 U.S.C. § 201(b)(1). After his acquittal on the bribery charges, on December 4, 1974, Krasn was indicted on twenty-five counts of the payment of gratuities to government meat graders in violation of 18 U.S.C. § 201(f).

After the gratuities charges were filed, Katz, Krasn's attorney, engaged in plea negotiations with an Assistant U. S. Attorney named Bonner who handled both the bribery-gratuities cases and the initial stages of the antitrust investigation. These negotiations eventually led to Krasn entering a guilty plea to four of the gratuities counts on April 1, 1975.

At the evidentiary hearing in the district court there was conflicting testimony as to what was included in the plea bargain. Katz testified to a telephone conversation with Bonner which occurred on March 10, 1975. During this conversation, Katz said that he wanted the matter concluded so that there would not be any further criminal proceedings against Krasn based on his past activities. When Bonner asked what he meant, Katz said that the only things which he could think of were violations of the Internal Revenue laws. According to Katz, Bonner then agreed to include possible violations of the Internal Revenue laws. Bonner could not recall the details of the March 10 conversation. However, the government relied upon three letters which were exchanged between Bonner and Katz to memorialize the plea agreement. In a letter dated March 17, Bonner agreed to dismiss the remaining counts of the indictment, and forego prosecution on charges arising from the giving of bribes or gratuities, if Krasn pled guilty to four of the gratuities counts.[2] Katz responded in a let-

---

1. The district court had jurisdiction pursuant to 18 U.S.C. § 3231. Krasn filed a timely notice of appeal. This court has jurisdiction under 28 U.S.C. § 1291.

2. This letter provided as follows:
   "This is to confirm our telephone conversation of March 10, 1975.
   "You represented to me that your client, Reuben Krasn, will move to change his plea and plead guilty to four counts of the indictment. This plea will be acceptable to the Government.
   "In connection with pleas of guilty to four counts of the indictment, I have represented to you that the Government will move to dismiss the remaining counts of the indictment at the time of sentence. In addition, the Government agrees to forego further criminal prosecution of your client, Reuben Krasn, and Globe Packing Company on charges stemming from or arising out of the giving of bribes or gratuities to U.S. Department of Agriculture Meat Graders assigned to grade beef at Globe Packing Company.
   "I trust that this satisfactorily memorializes the plea agreement. If you have any questions, please do not hesitate to contact me."
   Clerk's Record (C.R.) 703.

ter dated March 20, agreeing to Bonner's letter provided that it was understood that the government would not prosecute Krasn under the Internal Revenue laws for the giving of bribes or gratuities.[3] In a letter dated March 25, Bonner replied that the charges included criminal violations of the Internal Revenue laws.[4]

After the evidentiary hearing, Judge Lucas concluded that the plea bargain did not include a promise not to institute a criminal antitrust proceeding against Krasn. Judge Lucas stated that:

". . . the evidence does not show any objective basis for concluding that the plea agreements in the gratuities cases included a blanket immunity from prosecution for all suspected criminal acts. It doesn't appear to the Court from considering the evidence that the issue of blanket immunity was ever a subject of mutual consideration between the Government and the defendants in the negotiation of the plea agreements. . ."

Reporter's Transcript (R.T.) 235–236.

■ Prior to our review of the district court's interpretation of the agreement, we make a few general observations. Although plea bargaining is a matter of criminal jurisprudence, a plea bargain itself is contractual in nature and "subject to contract-law standards." *United States v. Arnett*, —— F.2d ——, —— (9th Cir., Nov.

26, 1979). Any dispute over the terms of the agreement is to be resolved by objective standards. *Id.* What the parties agreed to in the plea bargain agreement is a question of fact to be resolved by the district court. *Id.* Therefore, this court's review of the findings made by the court below are subject to the clearly erroneous standard. *United States v. Minnesota Mining & Manufacturing Co.*, 551 F.2d 1106, 1109 (8th Cir. 1977); see *United States v. Botero*, 589 F.2d 430, 433 (9th Cir. 1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045; *United States v. Agosto*, 502 F.2d 612, 614 (9th Cir. 1974).

■ We have little difficulty in concluding that the findings of Judge Lucas were not clearly erroneous. Initially, we note that Judge Lucas was the judge who accepted Krasn's guilty plea under the plea bargain. There was no evidence to support the interpretation that Krasn had been given immunity for all previous criminal acts. The terms of the agreement were quite specific as the letters between Katz and Bonner reveal. We therefore hold that the plea bargain could not in any way be interpreted as a bar to the government's later prosecution of Krasn's criminal antitrust charge.

Much more critical than his argument about the interpretation of the agreement is Krasn's allegation of bad faith by the

3. Katz's response provided, in part, as follows:
"Thank you for your letter of March 17, 1975. That letter sets forth our agreement provided that it is understood and agreed that the reference therein to Globe Packing Company includes and embraces all of the officers, directors and employees thereof, and that the word 'charges' in the phrase 'charges stemming from or arising out of the giving of bribes or gratuities to U.S. Department of Agriculture Meat Graders assigned to grade beef at Globe Packing Company' includes and embraces alleged violations of Internal Revenue laws or regulations, and that the designation 'U.S. Department of Agriculture Meat Graders' therein includes and embraces meat inspectors."
C.R. 704.

4. And Bonner's final letter provided, in part, as follows:

"First, the word 'charges' in my letter of March 17, 1975 does include criminal violations of the Internal Revenue laws. Naturally, I cannot compromise potential civil tax liability.
"Second, the term 'U.S. Department of Agriculture Meat Graders' does not encompass Department of Agriculture inspectors. However, as I indicated to you, the Government will agree to forego prosecution of Mr. Krasn, and Globe Packing Company, and other officers and employees of the company on criminal charges stemming from the giving of money or other gratuities to such inspectors, provided, however, that all such payments or gifts are promptly disclosed to the FBI or to a federal grand jury.
"With respect to other 'officers, directors and employees' of Globe Packing Company the same type of disclosure will be required."
C.R. 705.

government. At the time of the plea agreement Bonner knew about the pending antitrust investigation but he did not disclose this to Katz. Krasn argues that due process required that the prosecutor disclose the existence of the investigation.

■ Initially, we note that the plea bargaining phase of the criminal justice system "must be attended by safeguards to insure the defendant what is reasonably due in the circumstances." *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). One of these safeguards is a duty of good faith that we require of our prosecutors who are, after all, merely serving as representatives of the people.[5] In certain cases, this duty of good faith would encompass an obligation to inform a defendant during plea bargain negotiations of other possible criminal charges which may be filed. This however, was not such a case.

■ In the present case, we do not believe that the failure to disclose amounted to the type of prosecutorial misconduct which rises to the level of a denial of due process. *See United States v. Butler*, 567 F.2d 885 (9th Cir. 1978); *Scarborough v. State of Arizona*, 531 F.2d 959 (9th Cir. 1976). There are many factors which can be considered in making this determination; each case turns on its own facts. There are two considerations which we deem important to our conclusion here.

First, the gratuities charges and the antitrust charge involved independent criminal transactions. One arose from the illegal influencing of government agents; the other arose from the illegal fixing of prices. The only similarity between them is that they both arose from the same industry-wide investigation of the meat-packing industry, and that many of the defendants in the two cases were the same.

And, the second and more important factor is that the antitrust investigation was, at most, only at a preliminary stage. Judge Lucas found that the government "was not conducting an active, ongoing antitrust investigation at the time of bargaining for pleas in the gratuities cases." R.T. 236. If the government had its antitrust case against Krasn ready to submit to the grand jury during the plea negotiations on the gratuities charges, then a different result might be required. However, the government did not obtain an indictment against Krasn on the antitrust charge until three years after he had pled guilty under the plea bargain.

### 2. Pre-Indictment Delay

Krasn argues that the charge against him should have been dismissed because of pre-indictment delay. He asserts that an unjustifiable delay occurred between the time when the government first learned of the possible antitrust violations (June 1973), when an active investigation was undertaken (December 1975), and when the indictment was filed against him (April 1978). The only prejudice claimed by Krasn was

---

5. Justice Sutherland best explained the duties and obligations of prosecutors in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor— indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

295 U.S. at 88, 55 S.Ct. at 633. And, as Justice Douglas more figuratively described this same duty:

"The function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial."

*Donnelly v. De Christoforo*, 416 U.S. 637, 648– 649, 94 S.Ct. 1868, 1874, 40 L.Ed.2d 431 (1974) (Douglas, J., dissenting).

that he entered a guilty plea to the gratuities charges. The impeachment value of this conviction, according to Krasn, effectively prevented him from taking the stand in the present case.

■ In the pre-accusatory stage of criminal proceedings, in addition to the applicable statute of limitations, defendants are protected from undue delay by the Due Process Clause. *United States v. Marion,* 404 U.S. 307, 322–324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. West,* 607 F.2d 300, 304 (9th Cir. 1979). This constitutional safeguard plays only a limited role in protecting against oppressive delay. *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Walker,* 601 F.2d 1051, 1055–1057 (9th Cir. 1979); *United States v. Pallan,* 571 F.2d 497, 499 (9th Cir. 1978), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2249, 56 L.Ed.2d 411. In determining whether pre-indictment delay may bar prosecution, this court has held that three elements must be considered: (1) the actual prejudice to the defendant, (2) the length of the delay, and (3) the reason for the delay. *United States v. Mays,* 549 F.2d 670, 677–678 (9th Cir. 1977); *West, supra,* 607 F.2d at 304. The most important element of this test is a showing of actual, nonspeculative prejudice to the defendant caused by the delay. *See West, supra,* 607 F.2d at 304; *Pallan, supra,* 571 F.2d at 500.

This court's decision in *Pallan* is directly on point with the present case.[6] In *Pallan* the government waited until after the defendant's criminal conviction in state court before obtaining an indictment from the grand jury. This court held that the impeachment value of the state conviction was *"not* the type of prejudice that due process principles seek to prevent." *Pallan, supra,* 571 F.2d at 500. Instead the prejudice must be of the type which results in an "unfair and unnecessary detriment to the defendant's ability to defend himself." *Id.*

■ Based on *Pallan,* we hold that Krasn has failed to show any actual nonspeculative prejudice resulting from the pre-indictment delay.[7] The fact that he stood trial in the present case as a convicted felon did not unfairly impair his ability to defend himself.

### 3. *Conspiracy Instructions*

Krasn argues that it was reversible error for the trial court to not instruct the jury that there may have been two conspiracies, one before and one after the price freeze. Since the five-year statute of limitations barred prosecution for the earlier conspiracy, Krasn contends that the jury should have received instructions about the proof necessary to convict for the later conspiracy, if it found that two separate conspiracies had in fact occurred. Additionally, Krasn claims that the court gave an erroneous instruction on continuation of, and withdrawal from, the conspiracy.

■ Since Krasn neither objected to the conspiracy instructions which were given nor requested an instruction on multiple conspiracies, on appeal he must show that the failure to give the instruction, and the instructions as given, amounted to plain error. Fed.R.Crim.P. 30, 52(b). "An improper instruction rarely justifies a finding of plain error." *United States v. Glickman,* 604 F.2d 625, 632 (9th Cir. 1979); *see Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). "A plain error is a highly prejudicial error affecting substantial rights." *United States v. Giese,* 597 F.2d 1170, 1199 (9th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 480, 62 L.Ed.2d 405. Only in exceptional situations

---

**6.** Krasn suggests that *Pallan* is distinguishable because the delay and successive prosecutions in his case were caused by the same office. While this argument may have some merit when the third factor is considered (i. e., the reason for the delay), it has no bearing at all on our consideration of the prejudice to the defendant.

**7.** Because we conclude that Krasn has failed to satisfy the first factor of our test for determining unjustifiable pre-indictment delay, we need not consider the other two elements relating to the length of the delay, and the reason for the delay.

will this court reverse a criminal conviction because of plain error. *Id.* It must be a situation where reversal is necessary to preserve the integrity and reputation of the judicial process, or to prevent a miscarriage of justice. *Id.*

Krasn cannot be afforded any relief based on his argument about multiple conspiracies. Whatever error may have occurred did not rise to the level of plain error. Initially, we note that Krasn concedes that "there was sufficient evidence from which the jury could have found a single conspiracy . . . or . . . concluded that Krasn participated in a post-price freeze conspiracy. . . ." Moreover, his argument on appeal rests on two faulty premises relating to the statute of limitations and the existence of two conspiracies.

■ Krasn asserts that since the alleged error implicates the statute of limitations, it may be raised for the first time on appeal. This is contrary to the rule of this circuit. *Forthoffer v. Swope*, 103 F.2d 707, 709 (9th Cir. 1939); *Pruett v. United States*, 3 F.2d 353, 354 (9th Cir. 1925).

■ Krasn's entire argument is based upon his allegation that there *may* have been two conspiracies, one before, and the other after, the price freeze. Only if this supposition is accepted can he gain any support from the two principal cases which he relied upon: *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), and *United States v. Borelli*, 336 F.2d 376 (2d Cir. 1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555. However, reviewing this alleged error, as we are, under the plain error standard, we hold that the price freeze cannot be viewed as any type of a division between two separate conspiracies. After all, the cast of characters to the conspiracy, as well as its purpose, remained the same in spite of the price freeze. Because of this, we adopt the following approach which was used by the Sixth Circuit in a case very similar to the present:

> "Even if the price freeze were to be considered as interrupting an existing con-

spiracy, if the conspiracy were resumed upon the termination of the price freeze, the intervening period is more properly characterized as a period of suspension of activities rather than a termination resulting in two separate conspiracies."

*Continental Baking Co. v. United States*, 281 F.2d 137, 154 (6th Cir. 1960).

■ We need not be detained long by Krasn's challenge to the instruction on withdrawal from the conspiracy. The jury was instructed that the "indictment charges a continuing conspiracy from at least 1965 until 1974, which, once its existence has been established, is presumed to continue unless there is affirmative evidence that the defendant abandoned, withdrew from, or disavowed the conspiracy or defeated its purpose." R.T. 1370. Krasn claims that this instruction improperly shifts the burden of proof and also misstates the law. We disagree. Not only was this instruction not plain error, but it was a correct statement of the law as well. The withdrawal instruction did not contain any of the offensive language which the Supreme Court condemned in *United States v. United States Gypsum Co.*, 438 U.S. 422, 463–465, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). And, the instruction parallels our statement of the relevant law in *United States v. Basey*, 613 F.2d 198 (9th Cir., 1979), where we stated that: "participation in the conspiracy is presumed to continue until the last overt act of the conspirators unless [the defendant] produces affirmative evidence of withdrawal." 613 F.2d at 202.

### 4. *Insufficient Evidence*

■ Krasn challenges the sufficiency of the evidence to support one of the alternative theories by which the jury could have found the intent element satisfied. The basic instruction to the jury was that they had to find that Krasn's action either: (1) had the effect of fixing, raising, or stabilizing prices, and been undertaken with the knowledge of their probable anti-competitive effects, or (2) had been undertaken with the conscious purpose of achieving

such an anti-competitive effect on prices.[8] Krasn agrees that the instruction was legally correct under *United States Gypsum,* 438 U.S. at 444, 98 S.Ct. 2864. Nevertheless, he argues that there was insufficient evidence to show that his and the other meat packers' actions had the effect of fixing, raising, or stabilizing prices (i. e., the first alternative). Therefore, according to Krasn, his conviction must be reversed because it may have been based on this factual inadequacy. Krasn makes no challenge to the sufficiency of the evidence to support a jury finding that his and the other meat packers' actions were undertaken with the conscious purpose of achieving such an anti-competitive effect on prices (i. e., the second alternative).

Viewing the evidence in the light most favorable to the government, we have little doubt but that it could support the jury's findings under either theory. However, we need not make this examination. This court draws a distinction between cases where a jury's action could have been based on erroneous legal ground as opposed to factual inadequacy. The former situation supports reversal while the latter does not. *United States v. Jessee,* 605 F.2d 430, 431 (9th Cir. 1979); *United States v. Outpost Development Co.,* 552 F.2d 868, 869–870 (9th Cir. 1977), *cert. denied,* 434 U.S. 965, 98 S.Ct. 503, 54 L.Ed.2d 450; *See United States v. Phillips,* 606 F.2d 884, 886 n.1 (9th Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 685, 62 L.Ed.2d 657. We must therefore reject this assignment of error since the evidence was factually sufficient to support one of the theories by which the jury could have found the intent element satisfied.

### 5. *The Summary Charts*

The government introduced three multicolored bar charts into evidence which allegedly showed the price fixing among the meat packers. The charts contained a weekly analysis of the number of offers the packers made to Safeway during the 1972 through 1974 period: (1) at the most common price, (2) below the most common price, and (3) above the most common price. The MB–4 forms prepared each week by Safeway which showed the offering and purchase price of beef were the basis for the charts.

Krasn contends that the charts were misleading because one-third of the time they covered included the price freeze and post-price freeze periods which were not covered by the conspiracy. There was no objection on this basis at trial. Any confusion caused by this did not rise to the level of plain error (*see* discussion *supra*). Krasn also claims the charts were misleading because their captions and vertical coordinates referred to vendors, when, in actuality, they reflected the offers made to Safeway. This meant that if one vendor made three offers at an identical price, this would appear on the chart as representing three offers from three different packers. No error may be predicated on this point since this alleged discrepancy was made abundantly clear to the jury on cross-examination.

The charts were based on the MB–4 forms, which were, according to Krasn, unreliable. It was alleged that four of the packers who sold to Safeway had rigged their bids with the Safeway buyer. However, this rigging related only to the quanti-

---

**8.** The relevant part of the instruction provided as follows:

"The defendant's intent to effectuate the object of the conspiracy may differ depending upon the circumstances of the case. If you find that the acts of the defendant and the alleged co-conspirators had the effect of fixing, raising, or stabilizing carcass-beef prices in the Los Angeles area, then it is sufficient if defendant's acts were untaken [sic] with the knowledge of their probable anticompetitive effects. If, however, you find that the acts of the defendant and the alleged co-conspirators did not have the effect of fixing, raising or stabilizing prices, the intent element will only be satisfied if you find that the acts done by the defendant were undertaken with the conscious purpose of achieving such an effect upon prices. Of course, if you fail to find the element of intent proven beyond a reasonable doubt, you must acquit the defendant."
R.T. 1372.

ty of beef purchased, not to the price. The charts only dealt with price, not quantity. When the area manager for Safeway was on the stand, Krasn was precluded from exploring this issue on cross-examination. However, the court suggested that this was a matter for the defense to bring up in its case in chief. No error was committed. Cross-examination was properly limited on relevancy grounds. Krasn was given the opportunity to develop the issue, but chose not to do so when the defense presented its case.

■ Krasn's final contention about the charts is that they should not have been admitted into evidence and given to the jury. He relies upon our case of *United States v. Abbas*, 504 F.2d 123 (9th Cir. 1974), *cert. denied*, 421 U.S. 988, 95 S.Ct. 1990, 44 L.Ed.2d 477,[9] where we suggested that the better practice was to use charts as a testimonial aid for witnesses and as a visual aid for counsel's argument, but not to submit them to the jury. We agree that the charts should not have been admitted into evidence, but we also hold, as we did in *Abbas*, that the admission of the charts was not reversible error. Krasn had a full opportunity to challenge the facts, figures, calculations, computations and methods upon which the charts were based. *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980); *Abbas, supra*, 504 F.2d at 125. Moreover, the court gave a limiting instruction to the jury cautioning them not to give undue weight to the charts since they were not evidence or proof of any facts themselves.[10] *Abbas, supra*, 504 F.2d at 125. Krasn neither objected to the instruction as given nor requested any additional language limiting the use of the charts. *Id.*

**9.** The government chose to ignore the *Abbas* decision. We should not need to remind the government of the importance of addressing the principal cases relied upon by an adversary, especially where, as here, they are binding authority.

**10.** The court admonished the jury as follows: "The testimony of a witness and the charts or summaries prepared by him and admitted in evidence are received for the purpose of explaining facts disclosed by books, records, and other documents which are in evidence in the case. Such charts or summaries are

### III. CONCLUSION

Based on the preceding discussion, we hold that there was no error which could support reversal of Krasn's conviction. He received a fair trial in a heavily contested and complicated case.

AFFIRMED.

not in and of themselves evidence or proof of any facts. If such charts or summaries do not correctly reflect facts or figures shown by the evidence in the case, the jury should disregard them.

"In other words, such charts or summaries are used only as a matter of convenience. So if, and to the extent that, you find they are not in truth summaries of facts or figures shown by the evidence in the case, you are to disregard them entirely."
R.T. 1362–1363.