**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**ROCKWELL INTERNATIONAL COR-
PORATION, Defendant–Appellant.**

No. 89–50120.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 10, 1990.

Decided Jan. 31, 1991.

James F. Neal, Neal & Harwell, Nashville, Tenn., Thomas E. Holliday, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant-appellant.

George B. Newhouse, Jr., Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before REINHARDT and LEAVY, Circuit Judges, and THOMPSON *, District Judge.

LEAVY, Circuit Judge:

## PROCEEDINGS IN THE DISTRICT COURT

This is a criminal case in which Rockwell International Corporation, Inc. (Rockwell), a defense contractor, pled guilty to a charge of procurement fraud. The grand jury charged Rockwell in a superceding indictment in June of 1988 with violations of 18 U.S.C. §§ 371, 401, 1001, and 1341 (West 1988). Rockwell moved to dismiss the indictment or to suppress evidence, claiming the government failed to honor its promises and follow its own rules established by the Voluntary Disclosure Program.

The Voluntary Disclosure Program (the program) was initiated in 1986 by the government to encourage defense contractors to engage in self-policing to reduce the likelihood of fraud related to accounting on Department of Defense contracts. In exchange for their disclosures of fraud, the program offered defense contractors certain benefits.

The government claimed that even though Rockwell had made certain disclosures, it had done so under circumstances that did not meet the criteria for participation in the program. The government also claimed Rockwell's disclosures were not based on any commitments or promises made by the government in exchange for those disclosures. Finally, the government claimed that, as a matter of law, Rockwell was not entitled to relief because the program consists only of "in-house" guidelines that have no legal foundation.

The district court orally denied Rockwell's motion without explanation. At that time, Rockwell did not request the court to make findings of fact and conclusions of law. Rockwell entered a plea of guilty to

conspiracy to defraud and making false statements to the United States, in violation of 18 U.S.C. §§ 371, 401, and 1001. The remaining counts of the indictment were dismissed.

## FACTS

In 1979, the Air Force awarded Rockwell a contract (the "development contract") to manufacture and deliver four NAVSTAR Global Positioning System (NAVSTAR) satellites. The contract was a fixed price incentive contract, which means that Rockwell was to perform its work for a set price. If Rockwell's contract costs exceeded the set price, the Air Force agreed to pay 65% of the excess costs while Rockwell would absorb the remaining 35%, up to an agreed-upon ceiling after which Rockwell would be responsible for all costs.

In 1983, the Air Force awarded Rockwell a second contract (the "production contract") to manufacture, deliver, and launch twenty-eight NAVSTAR satellites. This contract was a firm fixed-price contract that required Rockwell to deliver satellites for the agreed price regardless of its production costs.

Under both contracts, Rockwell subcontracted portions of the work to the Defense Communications Division of International Telephone and Telegraph Corporation (ITT). ITT built the radio equipment used to transmit encoded navigational signals from orbiting NAVSTAR satellites. However, in 1982, when negotiations between the Air Force and Rockwell were ongoing for the production contract, Rockwell discovered that certain parts ITT had supplied for the development contract were nonfunctional and required repairs. ITT made the repairs at Rockwell's request, but a dispute arose between ITT and Rockwell as to who should pay for the repairs. Rockwell ultimately concluded that it should pay, but knew that it could be reimbursed for only 65% of the cost under the development contract.

* Honorable Bruce R. Thompson, Senior United States District Judge for the District of Nevada, sitting by designation.

To avoid incurring unreimbursed costs, Rockwell told ITT it would negotiate a "package deal" with the Air Force to cover the repair claims for the development contract under the production contract. Rockwell submitted a cost bill to the Air Force of $42.3 million for the ITT subcontract portion of the production contract, which included the entire repair costs incurred under the development contract. The Air Force contracted with Rockwell to produce the satellites for a total cost of $1.7 billion, including the $42.3 million ITT subcontract.

Under the agreement, Rockwell was required to certify that the cost or pricing data it had submitted to the Air Force was "accurate, complete, and current." The government required such certification under the Truth in Negotiations Act, 10 U.S.C. § 2306(f)(1) (West 1988). Accordingly, on December 15, 1982, Rockwell certified that the ITT subcontract for $42.3 million contained pricing data that was "accurate, complete, and current." Thereafter, Rockwell did not reveal to the government that the $42.3 million included total costs of repairs that were only partially reimbursable under an entirely separate contract.

In March 1983, Rockwell and ITT agreed to a definite price of $337,000 for the repair claims. Rockwell then deducted this cost from the $42.3 million it had negotiated earlier with ITT for the production contract and executed a purchase order to pay ITT only $41,963,000 for the production contract. Next, Rockwell inexplicably drew up additional purchase orders totalling $337,000 to pay ITT for the repair claims, and billed the government for those orders under the development contract. Thus, Rockwell unlawfully obtained at least $337,000 on the production contract while at the same time it obtained a 65% reimbursement of the repair costs under the development contract, thereby defrauding the Air Force twice since Rockwell received double reimbursement for the same costs.[1]

Rockwell then prepared a misleading internal memo for the ITT production subcontract negotiations that omitted any reference either to the repair orders or to the price reduction on the ITT subcontract.

Starting in February 1985, the Defense Contract Audit Agency (DCAA) audited the ITT production contract as part of a routine post-award action for an Air Force contract. The letter notifying Rockwell of the audit requested the subcontract price that was certified and any negotiation memorandums with ITT. As a result of that notification, Rockwell's Major Subcontracts Manager, Robert L. Zavodnik, called ITT to ask "if there was any way that DCAA could track through ITT's file from the rework orders to the production contract and price change." An ITT employee told Zavodnik he did not think so. Zavodnik then asked the ITT employee to call him after the DCAA audit and let him know if any problems had developed.

The Rockwell employees involved in the double-billing went to the Controller of the Satellite Division at Rockwell and asked for advice on how to deal with the problem during the audit. The Controller checked with the legal department and advised the employees not to mention the repair orders when they talked with the government auditors. Further, they were advised to explain the discrepancy between the certified development contract price and the ITT purchase order price as the result of an "iterative process" and to explain that the misleading case file "could have been written better." The Rockwell employees followed these instructions.

The government auditors uncovered the discrepancy and questioned Rockwell repeatedly about it. At this time, no one from Rockwell informed the auditors of the actual details surrounding the discrepancy. In fact, during a final conference, the Controller told the DCAA in May 1985 that Rockwell had no additional information and that it was Rockwell's contention that no defective pricing had occurred. Later, one

---

1. It is worth mentioning that at least one Rockwell employee, Ralph H. Lind, the Project Materials Manager, warned that his company's planned actions "would be dumb because you'd double-ding the Feds." Lind repeatedly tried to warn one of the Rockwell individual defendants that the planned actions were improper, but that warning fell on deaf ears.

of the Rockwell employees who became an individual defendant in the case against Rockwell admitted to Rockwell investigators that what he told DCAA "was a lie."

On May 9, 1985, the DCAA reported "defective pricing" in the ITT subcontract and recommended a downward price adjustment in the production contract of $446,284.[2] At that time, Rockwell began its own investigation to respond to the government's audit.

Not until one year later, in March 1986, did Rockwell make a required written response to the DCAA audit. In that response, Rockwell disclosed the connection between the repair claims and the reduction in price on the production subcontract. Rockwell admitted the agreement it reached with ITT for ITT to withdraw the disputed repair claim from the development contract "may well have been pricing data."

Under Defense Acquisition Regulation (DAR) 3–807.1(a)(1), "cost and pricing data" is defined as including "all facts existing up to the time of agreement on price which prudent buyers and sellers would reasonably expect to have a significant effect on price negotiations."[3] If the required certification falsely or incompletely discloses the contractor's costs as of the date of the certificate, as happened here, "defective pricing" has occurred. Accordingly, Rockwell agreed that the Air Force was entitled to a downward price adjustment on the production subcontract.[4]

After the government audit, DCAA had alerted its headquarters in June of 1985 that it suspected "irregular conduct" on Rockwell's part during DCAA's defective pricing reviews, including possible false statements and failure to disclose. The DCAA recommended that "appropriate investigative agency action" be taken, and reported that it had already alerted the local Air Force Office of Special Investigation (AFOSI). The AFOSI opened a fraud inquiry file and in August 1986 began a substantive investigation. The matter was also referred to the U.S. Attorney's Office for criminal investigation in October 1985.

In July of 1986, the Department of Defense announced its Voluntary Disclosure Program for defense contractors.

On October 2, 1986, at Rockwell's request, DCAA auditors met with the Controller of the Satellite Division and the corporate attorney who was conducting Rockwell's internal investigation of the matter. Rockwell advised the DCAA that it believed there had been "violations of Rockwell's business ethics." The attorney then presented a report that revealed the details of the defective pricing. At the meeting, Rockwell was informed of the AFOSI investigation.

In April 1987, the U.S. Attorney's Office notified Rockwell that it was also investigating the matter and that it intended to seek a multi-count indictment.

Six months later, in October 1987, fifteen months after the Voluntary Disclosure Program was announced, Rockwell for the first time contacted the administrator in charge of the program at the Department of Defense, the Assistant Inspector General, stating that Rockwell believed the prospective indictment "resulted from Rockwell's commitment to voluntary disclosure and efforts to implement a meaningful self governance program." The Deputy Inspector General of the Department of Defense then wrote to the Assistant U.S. Attorney General at the Department of Justice, asking that office to "notify and obtain the concurrence of the Defense Procurement Fraud Unit prior to any decision to prosecute [Rockwell]." The Department of Justice further asked the Department of

---

**2.** The audit report states: "Our review disclosed that Rockwell did not update its proposal, nor disclose information to any Government negotiators to reflect current, accurate and complete information concerning the ITT–DCD Subcontract. We recommend a downward price adjustment of $446,284."

**3.** This definition of "cost and pricing data" undermines Rockwell's claim that "there has always been great uncertainty as to the meaning of the phrase."

**4.** At the time this disclosure was made, as Rockwell admits, there was no Voluntary Disclosure Program in existence.

Defense to "ensure that the appropriate submissions are made to the Unit prior to such decision."

Following this letter, the Assistant U.S. Attorney responsible for the Rockwell case, Janet Goldstein, had conversations with the Assistant Inspector General in charge of the disclosure program. The Assistant Inspector General then wrote Ms. Goldstein, stating that he had contacted the AFOSI about the basis for the impending indictment. He stated:

The AFOSI advises me that its investigation was predicated by a referral from the Defense Contract Audit Agency (DCAA). The AFOSI further advised that the Rockwell internal investigation was, to the best of its knowledge, commenced after the DCAA identification of the issues reported in its referral to AFOSI. *Therefore, ... the matter before you is not viewed as one first disclosed by Rockwell to the Government.* In light of such, your conclusion is correct that the Department of Justice Voluntary Disclosure Program Guidelines are not operative.

(Emphasis added.)

Nonetheless, Rockwell maintains on appeal that the only reason it was indicted and convicted was because of its voluntary disclosures to the DCAA. Rockwell claims the program does not require that the disclosure precede the commencement of an audit or investigation. Rockwell contends the government breached express promises made to defense contractors who voluntarily disclose evidence of wrongdoing to the government, including: (1) a promise that the Department of Defense would apprise the Department of Justice of the nature and extent of a contractor's voluntary disclosure and cooperation; and (2) the Department of Justice's promise that all prosecutorial decisions concerning defense contractors who disclose wrongdoing would be made by a specialized unit within the department. Finally, Rockwell argues that when the government brought the indictment, it failed to follow its own rules, regulations, and procedures. Rockwell contends the Voluntary Disclosure Program will be severely undermined if this court does not reverse the district court and dismiss the indictment.

The government, on the other hand, argues that the facts of Rockwell's fraud were revealed in Rockwell's required response to the DCAA audit in March 1986, several months before the Voluntary Disclosure Program was even announced. According to the U.S. Attorneys, the government's audit discovered the defective pricing that resulted in a referral to the investigative unit of the Air Force. Moreover, the government maintains Rockwell made no attempt to gain admission to the Voluntary Disclosure Program by contacting the Assistant Inspector General, as the program requires, until the eve of indictment. The government states: "The Assistant Inspector General's ultimate conclusion that Rockwell's belated disclosures of fraud already known to the Government did not qualify it for admission to the Voluntary Disclosure Program was an agency decision committed to his sound discretion." Finally, the government challenges Rockwell's standing to assert that the government failed to follow guidelines in administering the Voluntary Disclosure Program.

In this case we must decide whether the establishment of the Voluntary Disclosure Program, and Rockwell's alleged revealing of its own wrongdoing in response to the program, constituted an agreement that the government breached when it subsequently indicted Rockwell.

### STANDARD OF REVIEW

The parties dispute the standard of review to be applied. According to Rockwell, our standard of review is governed by the issues, which it says are: (1) whether the government misapplied the facts to be used to determine whether Rockwell was a voluntary discloser; and if so, what are the consequences of the government's failure to honor its commitments to voluntary disclosers who qualify under the program; and (2) whether the government was required to observe its own rules, regulations, and procedures. Rockwell contends

that we must review these issues de novo. No law is cited to support this assertion.

The government claims we must apply the Administrative Procedures Act requirements, 5 U.S.C. §§ 701, 706, "when reviewing agency findings." The government claims it was entirely within the discretion of the Department of Defense to deny Rockwell admission to the Voluntary Disclosure Program, and that section 701 exempts from judicial review "agency action [that] is committed to agency discretion by law." Because the program is not mandated by law or regulation, but is merely the executive agency response to the recommendation of an advisory panel, the government claims there is no law for us to apply and therefore, no judicial review. The government claims this court cannot second-guess the Assistant Inspector General's right to decide which companies to admit to the program, and that there are no standards with which to review this decision. In short, the government claims there is no law to apply.

█ However, we are not reviewing the findings of an agency here, but rather the district court's decision to deny the motion to dismiss the superceding indictment or, alternatively, to suppress evidence. Essentially, Rockwell claims the U.S. Attorney engaged in misconduct by not following the applicable rules and by deciding to prosecute this case despite Rockwell's disclosure to the government of its wrongdoing. Therefore, the standard of review is the same as it is for any other criminal case where the court denies a motion to dismiss an indictment or to suppress evidence when prosecutorial misconduct is alleged.

Because our review is limited to whether the district court correctly decided there was no prosecutorial misconduct, we will not review any agency action except as it pertains to the decision to proceed legally against Rockwell. Consequently, we need not reach the arguments regarding the appropriateness of any agency action, except to the extent that Rockwell claims there was misconduct or a breach of some promise on the part of the Department of Justice or the Department of Defense.

This court has held that de novo review is proper where the district court refuses to dismiss an indictment for prosecutorial misconduct. *United States v. Spillone,* 879 F.2d 514, 520 (9th Cir.1989). This court stated:

> This is because the issue presents a mixed question of both law and fact. First, the trial court must determine whether the defendant's allegations of misconduct are true—a purely factual inquiry. Next, it must determine whether the prosecutor's conduct violated the Constitution or whether the misconduct was so serious that dismissal is warranted. This latter inquiry is a question of law.

*Id.*

Motions to suppress are also reviewed de novo. *United States v. Thomas,* 863 F.2d 622, 625 (9th Cir.1988). "Where no findings of fact were made or requested, we will uphold a trial court's denial of a motion to suppress if there is a reasonable view of the evidence that will sustain it." *United States v. Rabe,* 848 F.2d 994, 997 (9th Cir. 1988) (quotation omitted).

## DISCUSSION

### A. *The Voluntary Disclosure Program*

The Voluntary Disclosure Program was announced on July 24, 1986, in a letter to major defense contractors from the Deputy Secretary of Defense, William Howard Taft IV. According to the letter, voluntary disclosures of wrongdoing, coupled with contractor cooperation and corrective measures, would be viewed as "strong indications of an attitude of contractor integrity even in the wake of disclosures of potential criminal liability. [The Department of Defense] will consider such cooperation as an important factor in any decisions that the department takes in the matter."

Neither the Taft letter nor its enclosure further describing the program made any promises of favorable consideration regarding potential criminal prosecution as a result of voluntary disclosures.

Both the Taft letter and the enclosure specifically state that the Deputy Inspector

General of the Department of Defense is the contact for voluntary disclosure of criminal or civil fraud. On the other hand, matters not involving potential criminal issues are to be presented to the appropriate contracting officer or to the DCAA.

With respect to defense contractors who disclose wrongdoing and otherwise fit the criteria for program participation, the Taft letter states:

> Defining [Department of Defense] expectations of "cooperation" in any situation will depend on the individual facts or circumstances underlying the disclosure. However, [Department of Defense] may enter into a written agreement with any contractor seeking to make a voluntary disclosure where such an agreement will facilitate follow-on action without improperly limiting the responsibilities of the Government. This agreement, which may be coordinated with the Department of Justice, will describe the types of documents and evidence to be provided to [the Department of Defense] and will resolve any issues related to interviews, privileges, or other legal concerns which may affect [the Department of Defense's] ability to obtain relevant facts in a timely manner.

As for the expectations of disclosers who are recognized as participants in the program, the enclosure specifies the Department of Defense will:

1. identify someone to represent the Department of Defense in assessing contractor integrity in light of the disclosures;

2. try to expedite completion of investigations and audits "conducted in response to a voluntary disclosure"; and

3. "advise the Department of Justice of the complete nature of the voluntary disclosure, the extent of contractor cooperation and the types of corrective action instituted by the contractor." The enclosure warns: "As always, any determinations of appropriate criminal and civil fraud sanctions will be the ultimate prerogative of the Department of Justice."

On July 17, 1987, the Department of Justice circulated guidelines to the offices of the U.S. Attorneys for use with the Voluntary Disclosure Program. These guidelines repeat the four criteria for admission to the program and the actions the Department of Defense is willing to take regarding voluntary disclosers. Nine criteria for prosecution are identified, after which the guidelines state: *"The above described criteria are provided to give guidance to United States Attorneys and do not establish any rights for corporations being reviewed under the Voluntary Disclosure Program."* (Emphasis in original.)

A critical part of measuring integrity under the program is the timeliness with which contractors come forward. The Taft letter states: "[t]he contractors understand the Department's view that *early* voluntary disclosure, coupled with full cooperation and complete access to necessary records, are *strong indications of an attitude of contractor integrity* even in the wake of disclosures of potential criminal liability." The letter goes on to say "I believe that your corporate commitment to complete and *timely* disclosures of irregularities ... is essential[.]" (Emphasis added.)

### B. *Whether the Government Breached an Agreement With Rockwell*

Rockwell asserts that the government breached a promise by indicting Rockwell. Rockwell's position is that, as a voluntary discloser, it was at the very least entitled to have the Department of Defense Procurement Fraud Unit, not the United States Attorney, make any legal decisions regarding its fate.

■ We hold that Rockwell's argument that the Department of Defense failed to follow its own rules is dependent on whether Rockwell qualified for the program. We hold there was no breach of an agreement because the evidence does not support the contention that Rockwell qualified for the program in the first place. Instead, the evidence shows that the DCAA had uncovered Rockwell's fraud before Rockwell disclosed anything. The evidence shows that only on the eve of indictment did Rockwell attempt to contact the person designated to

begin the voluntary disclosure process. This conduct does not comport with the Taft letter's requirement that there be early disclosure to demonstrate the contractor's integrity. Therefore, Rockwell cannot claim a violation of the rules by asserting there was a broken promise.

■ Moreover, nowhere in the record is there any indication of any promise by the government not to indict Rockwell even if it were a voluntary discloser, and the appellate brief cites none. The Taft letter indicates that the Department of Defense may enter into a written agreement to resolve issues related to legal concerns, but no such written agreement or even oral agreement was entered into here.

Quoting *United States v. Arnett*, 628 F.2d 1162, 1164 (9th Cir.1979), Rockwell admits that "[i]n determining what was promised, courts 'look to ... what was "reasonably understood" by [the defendant]' " (quotation omitted). The Taft letter states only that it will consider cooperation "an important factor" for any decisions the Department of Defense makes, and the enclosure clearly warns that "[a]s always, any determination of appropriate criminal and civil fraud sanctions will be the ultimate prerogative of the Department of Justice." Rockwell could not reasonably understand, based on these statements, that it would not be indicted.

Rockwell argues that the facts here are analogous to those in *United States v. Minnesota Mfg. & Mining Co.*, 551 F.2d 1106 (8th Cir.1977), where the 3M company responded to calls to voluntarily disclose to the Watergate Special Prosecutor's Task Force evidence of misdeeds involving secret political contributions. After disclosure, the Task Force and 3M negotiated an unwritten agreement that 3M and its Chief Executive Officer would each plead guilty to a misdemeanor. The agreement was negotiated after the Task Force and 3M met at least twice, where the Task Force attorneys described to 3M the general policy considerations and their decision to charge 3M and the CEO with misdemeanors. *Minnesota*, 551 F.2d at 1109. Later, however, 3M was indicted for tax violations arising from the contributions. 3M argued that the agreement was that the misdemeanor pleas would fully dispose of all federal charges. *Id.*

Unlike the facts here, both parties in the 3M case agreed that they met and negotiated an agreement. The task before the Court of Appeals was to determine whether the district court was clearly erroneous in its findings that the evidence weighed in favor of 3M's version of the agreement. *Id.* at 1109–10. Because there is no doubt an agreement was negotiated in 3M, it does not help Rockwell here, where there is no such evidence.

## CONCLUSION

The district court's decision to deny Rockwell's motion to dismiss the indictment or, alternatively, to suppress evidence, is affirmed. The facts show a government audit already had uncovered evidence of defective pricing, and Rockwell had admitted its production contract price was too high due to defective pricing, months before Rockwell chose to reveal all the details to the wrong agency, the DCAA. Moreover, Rockwell belatedly contacted the Office of the Inspector General, the designated contact for admittance into the Voluntary Disclosure Program, only when it knew an indictment was forthcoming. No promises were made to disclosers that they would not be indicted. Under these circumstances, there was no prosecutorial misconduct in the indictment of Rockwell.

Because a reasonable view of the evidence supports it, the district court's decision to deny the alternative motion to suppress evidence is also affirmed.

REINHARDT, Circuit Judge, concurring in the judgment:

### I

Although I do not disagree with the majority's conclusion that Rockwell did not comply with a set of objective requirements for admission into the Voluntary Disclosure Program, I respectfully suggest that

my colleagues reach this decision for the wrong reason. Nothing Rockwell could have done would have resulted in its automatic acceptance into the program. The reason Rockwell's actions did not constitute compliance is that there are no objective requirements with which it could have complied. The program established by the Taft letter and its enclosure leaves the subjective determination whether to admit a particular contractor to the unreviewable discretion of the Department of Defense.

My colleagues deliberately bypass the first and critical question in this case: whether the government documents at issue here establish a program that is susceptible to judicial enforcement. Principles of orderly decision-making require that we must first determine whether those documents set forth criteria to be applied by the judiciary. Only if they do does it become necessary for us to decide whether in a given case such criteria have been satisfied.

The vice of the majority's approach is not simply that it is logically backwards. More important, it causes my colleagues to become entangled, improperly, in the unwarranted supervision of Executive Branch decisions and to exceed the limits of their proper judicial role. As I conclude below, *see infra* at 936–939, the Department of Defense and Department of Justice documents create no judicially enforceable rights. Therefore, courts have no business deciding whether Rockwell complied with any of the criteria set forth in those documents. By doing so in this case, the majority unintentionally opens the door to case by case evaluation of contractors' attempts to "qualify" for the program, despite the fact that the judiciary has not been authorized to make such judgments.

Regrettably, the practical consequence of the majority's approach may be considerable needless litigation. Although I recognize that my colleagues do not purport to decide the critical threshold fundamental question, their decision that Rockwell's actions do not measure up to an objective standard of compliance sends a false signal to contractors—a signal that given the

proper circumstances their actions could meet such a standard. Today the majority holds that Rockwell's actions were insufficient to qualify for admission into the program. In the next case we will surely face a claim by a contractor who has done far more than Rockwell. By subverting the ordinary logical processes and avoiding the critical threshold inquiry we perform a disservice to the courts, defense contractors, and the Department of Defense. Accordingly, I believe it is worthwhile to set forth clearly the reasons why the program at issue creates no judicially enforceable rights.

## II

Rockwell argues that dismissal of the indictment is warranted for what it deems a breach of a promise by the Department of Defense. Rockwell asserts that the Taft letter and its enclosure created an obligation on the part of the Department of Defense to: (1) identify someone to represent the Department in assessing Rockwell's integrity; (2) try to expedite completion of investigations and audits of Rockwell; and (3) advise the Department of Justice of the nature and extent of Rockwell's disclosure and any corrective action instituted by Rockwell. In addition, Rockwell argues that the government failed to comply with a procedure set forth in the Department of Justice guidelines requiring the United States Attorneys' office to notify and obtain the concurrence of the Defense Procurement Fraud Unit of the Department of Justice before initiating a prosecution against a voluntary discloser. In my view, neither the Department of Defense nor the Department of Justice documents grant defense contractors any judicially enforceable rights.

### A. *The Taft Letter and Enclosure*

The government argues that even if the Taft letter and its enclosure constitutes a general promise to apply certain procedures to all defense contractors that voluntarily disclose fraudulent practices, the promise creates no judicially enforceable rights because it is not contained in a stat-

ute or regulation. Thus, according to the Department, "there is no law to apply" in reviewing Department decisions implementing the Voluntary Disclosure Program. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971).

The government's position that an agency pronouncement worded as a promise can only bind the agency if the promise is contained in a regulation published in the Federal Register and promulgated in accordance with the requirements of the Administrative Procedure Act constitutes an overstatement of the law. Although in most circumstances agency pronouncements will only be given "the force and effect of law" if they "conform to [these] procedural requirements," *Rank v. Nimmo*, 677 F.2d 692, 698 (9th Cir.), *cert. denied*, 459 U.S. 907, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982), contract principles may require an agency to honor its word even where it does not speak through regulations. For example, despite the fact that plea bargain agreements and cooperation agreements are not promulgated as regulations, they are judicially enforceable against the government. *See, e.g., United States v. Krasn*, 614 F.2d 1229, 1233 (9th Cir.1980) (plea bargain agreement is contractual in nature); *United States v. Carrillo*, 709 F.2d 35, 36-37 (9th Cir.1983) (cooperation agreement is enforceable under contract principles). In this case it is necessary to determine whether there was a judicially enforceable agreement between the Department of Defense and Rockwell that Rockwell would be accorded the treatment outlined in the Taft letter and enclosure. More specifically, we need to decide whether the government made Rockwell and other defense contractors a unilateral offer which could be accepted by the unilateral action of the contractor.

I note first that Rockwell does not and cannot claim that it had a specific express agreement with the Department of Defense guaranteeing favorable consideration. The Taft letter enclosure states that defense contractors who wish to ensure that their interests will be protected can enter into written disclosure agreements with the Department of Defense and the Department of Justice. Had Rockwell entered into such an agreement, the government would have been bound to honor it. *See Carrillo*, 709 F.2d at 36-37 (affirming district court's dismissal of the indictment where government violated the terms of a disclosure agreement). However, there was no written disclosure agreement between Rockwell and either the Department of Defense or the Department of Justice. Therefore, if the Department of Defense breached a promise to Rockwell, it was a promise that must be implied from the Taft letter and its enclosure.[1] There are several reasons why there was no such judicially enforceable promise.

I begin with the background understanding that basic decisions about how to conduct a criminal investigation and prosecution are generally left to the discretion of the Executive Branch. *See e.g., Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985) (characterizing a prosecutor's decision not to indict as "a decision which has long been regarded as the special province of the Executive Branch"). Given the implications for the constitutional principle of separation of powers, courts do not inject themselves into traditionally Executive areas of decision-making unless there is a clear basis for doing so. *Cf. United States v. Chanen*, 549 F.2d 1306, 1313 (9th Cir.), *cert. denied*, 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977) (holding that a court may not dismiss an indictment, and thereby encroach upon the prerogatives of the Executive Branch "unless there is a clear basis in fact and law for doing so"). The case before us involves the traditionally Execu-

---

1. As my colleagues point out, Rockwell mistakenly relies on *United States v. Minnesota Mfg. & Mining Co.*, 551 F.2d 1106 (8th Cir.1977), where the court affirmed the dismissal of an indictment as the appropriate remedy for the government's violation of the terms of an oral plea agreement with the defendant. In that case the parties disputed the terms but not the existence of a plea agreement. Here, Rockwell did not enter into any specific agreement with the government.

tive realm of investigation: the Taft letter and enclosure concerns preliminary investigative measures regarding allegations of contractor wrongdoing. In the absence of clear evidence to the contrary, courts should not assume that the Department intended them to scrutinize Executive decisions about when and how to take such steps.

Unlike plea agreements, the kinds of Executive decisions involved here are not readily susceptible to judicial supervision. In the typical plea agreement case the Executive's promise concerns the government's actions vis-a-vis a criminal defendant who has either been indicted or is about to be: the Executive promises some form of immunity from prosecution. A court can enforce that promise with minimal intrusion into the day to day operations of the Executive by granting whatever immunity has been guaranteed. By contrast, here the alleged promise concerns decisions about internal Executive procedures—i.e., the identification of a Department of Defense official to assess the contractor's integrity, the expedition of the Department's investigation, and communications between the Departments of Defense and Justice. We should not lightly infer that the Executive Branch intended that such internal processes be subject to judicial control.

Moreover, the determination whether to admit a contractor to the program requires the exercise of Executive judgment. The enclosure stated: "[d]efining DoD expectations of 'cooperation' in any situation will depend on the individual facts or circumstances underlying the disclosure." That language indicates that the Department of Defense's decision whether to admit an individual contractor into the program will be based on subjective factors to be evaluated by the Department of Defense. Clearly, the Department was not setting up an objective system of evaluation suitable for

review by the courts or enforcement by judicial order.

There is another reason why I conclude that the Taft letter and enclosure did not contain an enforceable promise. The program does not merely require that in order to gain acceptance contractors must meet a particular standard. Rather, as set forth in the Taft letter enclosure, in order for a contractor to earn voluntary discloser status it must reach a specific understanding with the Department of Defense on a number of subjects. There must be agreements as to disciplinary action, restitution, and the scope and extent of future contractor cooperation.

A prudent contractor would therefore recognize that merely disclosing fraudulent acts to the Department guarantees nothing. Further understandings must be reached. To facilitate such understandings the Taft letter enclosure provided that "DoD may enter into a written agreement with any contractor seeking to make a voluntary disclosure where such an agreement will facilitate follow-on action without improperly limiting the responsibilities of the Government." [2] In addition, the fact that the criteria used by the Department to determine whether to accept a contractor into the program are subjective should alert potential disclosers that Department decisions whether to treat them as volunteers are discretionary.

Thus it is clear that the statements of the Department at issue cannot reasonably be understood as an offer to be bound to a unilateral contract with any defense contractor who provides disclosure information. [3] Rather, it is for the Department to determine whether a contractor should be treated as a voluntary discloser, and if so, what steps that contractor must then take in order to receive the benefits of the disclosure program. Defense contractors—

---

**2.** A written agreement is not necessarily required for a contractor to be admitted into the program so long as the specific oral agreement covers the necessary points, although I can see no reason why a sensible contractor would not insist on a written agreement.

**3.** "The law of contracts presents an apt model to guide and inform our analysis in the context of the facts presented by this case. We emphasize, however, that we are not obliged to follow blindly the law of contracts in assessing plea or cooperation agreements in all contexts." *Carrillo,* 709 F.2d at 36 n. 1.

who as a class are sophisticated and have access to sophisticated legal counsel—could not fail to appreciate this fact.

It is worth emphasizing that an agency is free to make virtually anything within its statutory authority a matter of right. Had the Department of Defense expressly promised particular treatment to all companies that disclose a fraudulent practice, we would be faced with a very different case. Here, however, as I have stated, there are two principal reasons why we should not read the Taft letter and enclosure as containing an enforceable promise to that effect. First, the documents do not establish the type of program that is suitable for enforcement by a court: the criteria for admission into the program are so inherently subjective that they are not susceptible to judicial application. Second, as the Taft letter and enclosure makes clear, the program requires specific future understandings between an individual discloser and the Department on a wide range of issues before it can be implemented in a particular case. Thus the Taft letter and enclosure merely comprises a means of alerting defense contractors to the existence of internal Department of Defense procedures; it does not serve as the source of individual contractor rights.

B. *The Department of Justice Guidelines*

Rockwell also claims that the indictment should be dismissed because the government failed to comply with Department of Justice guidelines. Rockwell's reliance on those guidelines is equally misplaced. Although the guidelines state that the United States Attorneys' office should notify and obtain the concurrence of the Defense Procurement Fraud Unit before initiating a prosecution against a voluntary discloser, they also expressly state that they "do not establish any rights for corporations being reviewed under the Voluntary Disclosure Program." In light of this unequivocal

statement, Rockwell's claim that it had a right to have the Department of Justice comply with the guidelines is meritless. *See United States v. Wilson,* 614 F.2d 1224, 1227 (9th Cir.1980) (holding that United States Attorneys' Manual guidelines do not have the force and effect of law).

Thus there is no governmental misconduct here, let alone governmental misconduct sufficient to require dismissal of an indictment. *See United States v. Larrazolo,* 869 F.2d 1354, 1357 (9th Cir.1989) (dismissal of indictment is the appropriate remedy for prosecutorial misconduct only if there is "flagrant error" that prejudices the defendant).

## CONCLUSION

I would not base our affirmance on Rockwell's failure to comply with some inchoate standard for admission into the Voluntary Disclosure Program. Rather, I would hold that the Department of Defense's decision whether to afford a defense contractor the benefit of that program is unreviewable. Although the majority opinion could arguably be read as adopting that position as an alternative holding,[4] I do not believe that is sufficient. It is important to point out clearly and expressly the discretionary nature of the Voluntary Disclosure Program. Additional judicial resources should not be wasted litigating the question whether contractors have met subjective criteria that can be applied only by the Department of Defense and that are not within the proper province of the courts.

**4.** *See ante* at 935. ("Moreover, nowhere in the record is there any indication of any promise by the government not to indict Rockwell even if it were a voluntary discloser.... The Taft letter indicates that the Department of Defense may

enter into a written agreement to resolve issues related to legal concerns, but no such written agreement or even oral agreement was entered into here.")