**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ramon Haro RAMOS,
Defendant–Appellant.**

No. 87–3074.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1988.
Decided Nov. 9, 1988.

Stephen L. Farnell, Winston & Cashatt, Spokane, Wash., for defendant-appellant.

William H. Redkey, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Before BEEZER, HALL and WIGGINS, Circuit Judges.

BEEZER, Circuit Judge:

Appellant, Ramon Ramos, was convicted of conspiring to distribute, and of distributing, more than 500 grams of cocaine, in violation of 21 U.S.C. § 846 (Count I), 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and in violation of 18 U.S.C. § 2 (Count II). He was convicted under 18 U.S.C. §§ 924(c) and 2 (Count III), for carrying and using a firearm during and in relation to narcotics trafficking.

Appellant was sentenced to five years' imprisonment on each count, with terms on Counts I and II to run concurrently.

Ramos timely appeals. He claims that (1) his conviction on Count III should be reversed, since the district court failed to define "in relation to," under 18 U.S.C. § 924(c)(1); (2) his five-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(B) violates due process and equal protection; and (3) his mandatory minimum sentence offends the eighth amendment's prohibition on "cruel and unusual punishment."

We affirm.

I

Ramos met co-conspirator Ellis in late February 1987. According to Ellis, Ramos indicated that he had recently received narcotics from a cousin in California. Ramos asked Ellis to assist him in distributing cocaine. Ellis indicated a willingness to do so and urged Ramos to make the acquaintance of a co-conspirator, Thompson, whom Ellis believed could assist in "moving the drugs." Ellis introduced Ramos to Thompson on February 27, 1987. Thompson agreed to sell cocaine for Ellis and, with this intention, made contact with another co-conspirator, Reynolds, in Seattle.

On February 28, 1987, Ellis, Ramos, Ramos' cousin, Thompson, and Thompson's cousin traveled to Seattle to meet Reynolds.

On arrival in Seattle, Ellis and Thompson met with Reynolds to discuss selling cocaine. Ellis and Thompson told Reynolds that they had one pound of cocaine with them and that they wanted him to sell it.

Reynolds sold one gram of cocaine on March 1, 1987. That evening, Reynolds decided he did not want to be involved in any further sales. He contacted the DEA.

Acting on instructions from DEA agents, Reynolds told co-conspirators Scott and Ellis that he had identified a prospective buyer for the entire one pound of cocaine. Ramos was present at this meeting.

Arrangements were made for Ellis, Scott and Ramos to return to Yakima, Washington, and to retrieve the one pound of cocaine. According to plan, Reynolds would telephone Thompson and Scott the following day. Thompson and Scott were to be in Yakima. Reynolds would notify them the moment the transaction was set up.

On March 3, 1987, Reynolds called Scott and told him that the buyers had decided to purchase an entire kilo of cocaine. Following this conversation, Ellis and Thompson drove to Ramos' residence in Yakima. According to Thompson, Ramos came out of his house carrying two plastic bags. Ramos placed one plastic bag in the trunk of the car and one under a seat.

The three men, Ellis, Thompson and Ramos, drove to Seattle. Thompson testified that during transportation of the cocaine, Ramos instructed him to remove a firearm from under his seat, and that Thompson did so. Thompson also testified that when Ramos stopped the vehicle to telephone Reynolds, a "suspicious van" approached and Ramos "pulled out" the firearm. Ramos does not deny this, but states that he pulled out the firearm to protect himself.

Thompson contacted Reynolds by telephone and arranged to meet Reynolds at the Edgewater Inn in Seattle.

According to Thompson, when they arrived at the Edgewater Inn, Ramos handed the cocaine to Thompson. Thompson then borrowed Ramos' jacket to conceal the cocaine.

Thompson's arrest, in a room designated for the transaction, took place shortly afterwards. During arrest, Thompson was found to be carrying a firearm. In Thompson's initial account, he stated that Ramos

instructed him to carry this firearm.[1] Thompson later testified that when he fell onto a hotel bed during arrest, the firearm hit him in the chest, and that this was the first time he knew he was carrying a firearm. Ramos and Ellis were arrested shortly afterwards, in the Edgewater Inn parking lot.

## II

■ Ramos claims that the district court's failure to define the phrase "in relation to," under 18 U.S.C. § 924(c)(1) constitutes reversible error. This argument is without merit.

Since this objection was not raised at trial, we review the jury instruction for plain error. *United States v. Stewart*, 779 F.2d 538, 540 (9th Cir.1985). Plain error is "highly prejudicial error affecting substantial rights[,] and is found only in exceptional circumstances." *United States v. Harris*, 738 F.2d 1068, 1072 (9th Cir.1984). There must be a high probability that error materially affected the verdict. *United States v. Williams*, 685 F.2d 319, 321 (9th Cir.1982).

Title 18, U.S.C. § 924(c) makes it a crime to "carr[y] a firearm unlawfully during and in relation to the commission of any felony ..." U.S.C.A. § 924(c) (West Supp.1985).

■ Appellant does not dispute that, while transporting one kilogram of cocaine to a prospective buyer, he instructed his co-conspirator (Thompson) to "pull the [.22 automatic pistol] out from under the front seat of the car and take a look at it." Thompson testified, and appellant did not dispute, that appellant later removed this firearm from under the seat "to defend himself," when a "suspicious van appeared" on route to the cocaine transaction.

Since the cocaine being carried was of substantial value, a rational inference is that appellant intended to defend either it or himself, or both, when he removed the firearm.

Appellant argues that since there is conflicting testimony as to whether he specifically told Thompson to hold the firearm "during" and "in relation to" the transaction,[2] and since the statute indicates that a firearm must be carried "during" and "in relation to" the felony, there is a high probability that absence of a definition for "in relation to" materially affected the verdict. We disagree.

First, appellant's felonious narcotics convictions, under 21 U.S.C. §§ 841(a), (b)(1)(B), and 846, are for conspiring to possess with intent to distribute, distributing, and knowingly aiding and abetting distribution of a quantity of cocaine in excess of 500 grams. The *actus reus* for these crimes includes activities leading up to the moment when a physical exchange of cocaine for cash occurred. Since these offenses necessarily involve a period of time prior to the final exchange of drugs for money "during" which appellant "carr[ied] the firearm," for the likely protection of himself or the narcotic, and during which time he apparently "pull[ed] the [firearm] out to defend himself," we need not focus on later facts.

Appellant carried the firearm to the Edgewater Inn. During this period, he openly handled and displayed the firearm. The firearm appeared in the narcotics transaction room, in possession of a co-conspirator who may have been instructed by appellant in handling this firearm. Appellant was immediately arrested. The inference that this firearm was carried "in relation to" the evolving narcotics crimes is not unreasonable.

■ The "in relation to" language connotes a causal connection between appellant's narcotics felonies and this firearm. The connection is supported by ample evidence. The connection permits the infer-

---

1. Thompson initially told the arresting officer, Agent Daly, that Ramos had insisted that Thompson carry the firearm.

2. Thompson initially told an arresting officer that appellant had told him to carry the firearm.

He later rescinded that statement. Thompson was discovered carrying the weapon. He claims to have first discovered that he was carrying the weapon when he was arrested.

ence that appellant carried this firearm "in relation to" the cocaine transaction.

As, then-Judge, now Justice Kennedy observed in *United States v. Stewart,* 779 F.2d 538 (9th Cir.1985), *cert. denied,* —— U.S. ——, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987), "the 'in relation to' language [in this statute] was not intended to create an element of the crime which did not previously exist [when the language was simply "during"], but rather was intended to make clear a condition already implicit in the statute," *id.* at 539, namely, that a person could not be prosecuted for inadvertently carrying a firearm in an obviously unrelated crime. The record does not support the conclusion that repeated appearance of this firearm, throughout the course of the narcotics conspiracy and transaction, was inadvertent.[3] Consistent with our holding in *Stewart,* we conclude that there is sufficient evidence on record that the firearm, here, may well have "embolden[ed]" one or more actors "who had the opportunity . . . to display or discharge the weapon to protect himself or intimidate others." 779 F.2d at 540.

Distinguishing *Stewart,* the government here provides sufficient testimony linking the firearm to the underlying narcotics felonies. *See Stewart,* 779 F.2d at 539. Appellant carried the firearm to the transaction. Appellant "pull[ed] it out" en route to the transaction. There is testimony that appellant ordered Thompson to "pull it out" en route to the transaction, possibly for Thompson to become familiar with the firearm. DEA Agent Daly testified that Thompson (from whose person the firearm was seized) initially accused his accomplice of bringing the firearm to the room, and accused "the other man" of insisting that Thompson carry the firearm into the room.

We cannot conclude, as appellant urges, that "it is almost a certainty" that appellant would have been found not guilty if the "during and in relation to" instruction had been supplemented with some further explanation of the term "in relation to."

We conclude that the verdict was not "materially affected" by the omission of a definition for the language "in relation to". *Williams,* 685 F.2d at 321. We conclude there was no plain error.

### III

■ Appellant argues that the classification system for sentencing under 21 U.S.C. § 841(b)(1)(B) is "arbitrary" and "unreasonable," since it classifies offenders according to quantity of narcotic and not according to purity of the narcotic possessed. Appellant also argues that this provision is "over-inclusive," since it punishes "the unfortunate defendant who possesses 500 grams or more of a substance which is primarily non-narcotic."

Since appellant possessed 999.3 grams of a substance which was 84% pure cocaine, and he was sentenced for possession of cocaine (cocaine hydrochloride) in excess of 500 grams,[4] further inquiry into the purity issue is irrelevant.

We recently addressed appellant's equal protection and due process arguments in *United States v. Klein,* 860 F.2d 1489, and in *United States v. Savinovich,* 845 F.2d 834 (9th Cir.1988).

---

**3.** We note that trafficking in narcotics is very often related to the carrying and use of firearms. *See, e.g., United States v. Laguardia,* 774 F.2d 317, 321 (8th Cir.1985) (court recognized "utility of firearms in advancing criminal adventures in narcotics"); *United States v. Grant,* 545 F.2d 1309, 1313 (2d Cir.1976) (judicial notice of use of firearms by cocaine dealers), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977); *United States v. Chase,* 692 F.2d 69, 71 (9th Cir.1982) (per curiam) ("pistol and cocaine found in defendant's house); *Stewart,* 779 F.2d at 539 (narcotics and "sawed off UZI" found in defendant's possession).

**4.** Title 21 U.S.C. § 841(a) states that, "it shall be unlawful for any person to knowingly or intentionally . . . possess with intent to distribute . . . a controlled substance. . . ."
  Title 21 U.S.C. § 841(b)(1)(B) states that,
  [a]ny person who violates subsection (a) of this section shall be sentenced as follows: [I]n case of a violation . . . involving (ii) 500 grams or more of a mixture or substance containing a detectable amount of—(II) cocaine . . . [or] (iii) 5 grams or more of a mixture or substance . . . which contains cocaine base . . . such person shall be sentenced to a term of imprisonment . . . not less than 5 years and more than 40 years . . . [without] parole.

As we observed in *Klein* and *Savinovich*, Congress clearly intended to base these mandatory minimum sentences on the quantity of narcotic possessed. *See Savinovich*, 845 F.2d at 839; *Klein*, 860 F.2d 1489.

Neither due process nor equal protection concerns are implicated by appellant's sentence under 21 U.S.C. § 841(b)(1)(B).

IV

■ Appellant argues that his five-year mandatory minimum sentence without parole under 21 U.S.C. § 841(b)(1)(B) is disproportionate to the crime committed, violating the eighth amendment prohibition on "cruel and unusual" punishment. In *Klein* and *Savinovich*, we applied those factors articulated in *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) to highly similar facts. We concluded that 21 U.S.C. § 841(b)(1)(B) did not violate the eighth amendment, as written or applied, in those cases. We continue to adhere to that conclusion and find proportionality analysis unnecessary on the facts here. *See Savinovich*, 845 F.2d at 839–40; *see also United States v. Holmes*, 838 F.2d 1175 (11th Cir.1988).

CONCLUSION

We conclude that the district court's failure to define the phrase "in relation to" could not have materially affected the verdict; that due process and equal protection are not violated, either by Congress' decision to grade mandatory minimum sentences by quantity or by any over-inclusion; and that appellant's five-year mandatory minimum sentence without parole, under 21 U.S.C. § 841(b)(1)(B), is not "cruel and unusual" and does not violate the eighth amendment.

AFFIRMED.