988 F.2d 125
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sergio PERAL-COTA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Moises BARRAZA-ARMENTA, Defendant-Appellant.
 Nos. 91-50102, 91-50136.
 United States Court of Appeals, Ninth, Circuit.
 Argued and Submitted Oct. 5, 1992.
Decided March 11, 1993.
 
 Appeal from the United States District Court for the Central District of California; No. CR 90-783 R, Manuel L. Real, Chief Judge, Presiding.
 C.D.Cal.
 AFFIRMED.
 Before HUG, FLETCHER and BRUNETTI, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellants Sergio Peral-Cota and Moises Barraza-Armenta appeal their convictions for smuggling illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(B), (C), and 18 U.S.C. § 1203(a). We reject the four arguments raised on appeal, and affirm appellants' convictions.
 
 I. Facts
 
 3
 In September 1990, four young friends, Daniel Arellano-Rosas, Isaac Sanchez-Hernandez, Mario Ortega-Estrada, and Victor Gomez-Garcia, from the same town in Mexico arranged to be transported illegally across the United States border into Southern California. The brothers of Gomez-Garcia and Arellano-Rosas, living near Los Angeles, were to pay the friends' crossing fees after they arrived in the United States.
 
 
 4
 The friends were initially taken to an apartment in Pomona, California. Appellant Barraza-Armenta told Sanchez-Hernandez that if any of the friends tried to run away, "[t]hings ... would be worse for us." Within a day or two of their arrival in Pomona, Arellano-Rosas, Sanchez-Hernandez, and Gomez-Garcia were transported by Peral-Cota and another man to Hollywood. Gomez-Garcia's brother paid Peral Cota $350 (a previous payment of $190 and three watches had been made), and Gomez-Garcia was permitted to stay in Hollywood. Arellano-Rosas and Sanchez-Hernandez were taken back to the apartment.
 
 
 5
 The next day, Peral-Cota again transported Arellano-Rosas and Sanchez-Hernandez to Hollywood. Both young men managed to elude Peral-Cota and get away from the vehicle despite the fact that Peral-Cota had not collected their transport fees. Apparently, they simply went to the apartment shared by the older Arellano-Rosas and Gomez-Garcia brothers.
 
 
 6
 Approximately three days later, Gomez-Garcia was kidnapped at gunpoint as he walked along a street in Hollywood with Arellano-Rosas and another man. He was forced into a car, where Peral-Cota hit him. According to Gomez-Garcia, the gun was handed to Peral-Cota, who was told to shoot Gomez-Garcia if he "made any kind of movement." Peral-Cota told Gomez-Garcia that "they would get even for everything if [Gomez-Garcia's] brother didn't pay."
 
 
 7
 After the group returned to the Pomona apartment (where Ortega-Estrada was still being held), several men, including Peral-Cota and Barraza-Armenta, beat Gomez-Garcia. That night, police raided the Pomona apartment and arrested, among others, Peral-Cota and Barraza-Armenta.
 
 
 8
 A six-count indictment charged both Peral-Cota and Barraza-Armenta with conspiracy to (1) illegally transport aliens in violation of 8 U.S.C. § 1324(a)(1)(B), (2) illegally conceal aliens in violation of 8 U.S.C. § 1324(a)(1)(C), and (3) detain aliens to compel payment of ransom in violation of 18 U.S.C. § 1203(a). Both appellants also were charged with separate counts of illegal concealment of aliens, and detention to compel payment. Peral-Cota was additionally indicted for illegal transportation of aliens, and for use of a firearm "during and in relation to" a crime of violence, in violation of 18 U.S.C. § 924(c).
 
 
 9
 The jury convicted Peral-Cota on all counts except the illegal concealment charge, and Barraza-Armenta on only the conspiracy count. We have jurisdiction over the timely appeals of both appellants pursuant to 28 U.S.C. § 1291 (1988).
 
 II. Discussion
 
 10
 A. The motion to suppress.
 
 
 11
 Barraza-Armenta seeks to suppress evidence gathered during a warrantless search of an apartment adjacent to the apartment at which the four friends stayed upon their arrival in the United States. Immigration and Naturalization Service ("INS") agents discovered Barraza-Armenta sleeping in the apartment, and also found a handgun and ammunition.
 
 
 12
 Gomez-Garcia's brother, Jorge Gomez-Garcia, filed a complaint with the Los Angeles Police Department after Victor's abduction. He gave the police two phone numbers given to him by the smugglers. A telephone check revealed that those numbers were in service at apartments C and D, 1453 West Phillips Boulevard, in Pomona, California.
 
 
 13
 At approximately 1:00 a.m., Pomona Police Department officers dispatched to the apartments detained five individuals in apartment C (including Peral-Cota). Between 4:30 a.m. and 5:00 a.m., INS Special Agent Jorge Guzman arrived. Victor Gomez-Garcia told Agent Guzman that "another person who had assaulted him could be found in an adjacent apartment," apartment D. This person, Gomez-Garcia said, had burn scars. Further, Gomez-Garcia told Guzman that the gun used in the kidnapping could be found in either apartment C or D. A search of apartment C failed to turn up the weapon.
 
 
 14
 Agent Guzman then walked next door to apartment D with another INS agent and four Pomona police officers. At the "metal gate," Guzman observed that the front door of apartment D was open. He saw a man he later learned to be Javier Meza standing in the doorway. Guzman asked Meza if he lived at apartment D. When Meza said "yes," Guzman asked if he and the police officers "could enter the apartment to search for a man with burn scars." Guzman insists that Meza consented to the entry. At the suppression hearing, Guzman testified to Meza's consent as follows: "There was a gentleman standing at the front door that leads into the front bedroom, and I asked him if we could enter and look for Mr.--uh--an individual with burn marks, and--which he said, Sure."
 
 
 15
 Agent Guzman found a man with burn scars sleeping on a mattress in the living room. This man turned out to be Barraza-Armenta. At about the same time, Pomona police officer Jesus Garcia also entered the living room; he asked "eight unidentified persons" also sleeping there if it would be "alright [sic] for the agents and officers, including [Garcia], to 'look around.' " Everyone consented. Garcia found rounds of .25 caliber handgun ammunition in a closed dresser drawer, and "observed" a .25 caliber handgun found in another closed drawer. The ammunition and gun were not found in the same room in which the people were sleeping.
 
 
 16
 The district judge denied Barraza-Armenta's motion to suppress. He found consent to enter the apartment and, apparently, exigent circumstances to search for a weapon.
 
 
 17
 Whether consent to a search was voluntary depends on the totality of the circumstances and is a question of fact reviewed under the clearly erroneous standard, United States v. Kelley, 953 F.2d 562, 566 (9th Cir.1992), although "whether as a general rule certain types of actions give rise to an inference of consent to search is a question of law that we review de novo." United States v. Mejia, 953 F.2d 461, 465 (9th Cir.1991), cert. denied, 112 S.Ct. 1983 (1992). The trial court's legal conclusion that exigent circumstances justified a search is reviewed de novo. United States v. George, 883 F.2d 1407, 1411 (9th Cir.1989).
 
 
 18
 Barraza-Armenta contends that the "consent" granted by Javier Meza was not voluntary, and did not legitimate the warrantless, early-morning police entry into apartment D. He points out that the government must shoulder a heavy burden in justifying warrantless entry into a dwelling:
 
 
 19
 "The government must prove that consent was given. It must show that there was no duress or coercion, express or implied. The consent must be 'unequivocal and specific' and 'freely and intelligently given'. There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. ' "Courts indulge every reasonable presumption against waiver" of fundamental constitutional rights.' Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact."
 
 
 20
 United States v. Shaibu, 920 F.2d 1423, 1426 (9th Cir.1990) (quoting United States v. Page, 302 F.2d 81, 83-84 (9th Cir.1962)) (footnotes omitted). Barraza-Armenta notes that Meza was not advised of the right to refuse consent, no officer or agent obtained a written waiver from Meza, and no showing as to the exact wording of Meza's consent was made.
 
 
 21
 The trial court, however, found that Agent Guzman was credible, and that Meza was not. The trial court is clearly permitted to make witness credibility assessments, and we defer to such findings. E.g., Page, 302 F.2d at 84.
 
 
 22
 A second consent question, not directly addressed by the trial court, arises in the context of Officer Garcia's request to "look around." According to his declaration, "[e]verybody consented to my search of the bedroom." The trial court apparently rested its ruling that the further search was permissible on the existence of exigent circumstances where
 
 
 23
 a substantial risk of harm to the persons involved or to the law enforcement process would arise if the police were to delay a search until a warrant could be obtained. The need for an immediate search must be apparent to the police, and so strong as to outweigh the important protection of individual rights provided by the warrant requirement. There must be no practical way to avoid these risks and yet follow the Constitution's mandate of detached judicial supervision of such intrusions.
 
 
 24
 United States v. Robertson, 606 F.2d 853, 859 (9th Cir.1979).
 
 
 25
 Exigency, like consent, is measured by considering the totality of the circumstances; " 'each case necessarily turns on its own peculiar facts.' " United States v. Castillo, 866 F.2d 1071, 1080 (9th Cir.1988) (quoting United States v. Marin, 509 F.2d 1211, 1213 (9th Cir.), cert. denied, 421 U.S. 967 (1975)). Here, there was reason to believe that a gun was in apartment D, and that Barraza-Armenta, suspected of a violent crime, was also in the apartment. We agree with the district court that, in the totality of the circumstances in this case, there was exigency.
 
 
 26
 B. Peral-Cota's conspiracy conviction.
 
 
 27
 Peral-Cota contends that his conspiracy conviction should be reversed because it is impossible to discern from the special verdict forms utilized by the jury which of the three objects within the conspiracy count formed the basis for convicting him of violating 18 U.S.C. § 371. Because the jury failed to reach a verdict on the illegal concealment of aliens count (one of the three purposes of the conspiracy count), Peral-Cota reasons that the jury may not have been unanimous.
 
 
 28
 His general argument contains two assignments of error. Peral-Cota maintains that the district judge's jury instructions only "exacerbate[d] the potential for confusion," and that the judge used a confusing special verdict form.
 
 
 29
 We review the district court's formulation of jury instructions for abuse of discretion. United States v. Johnson, 956 F.2d 197, 199 (9th Cir.1992). However, "[w]hether a jury instruction misstates elements of a statutory crime is a question of law reviewed de novo." Id.
 
 
 30
 With respect to Count One, the trial judge instructed the jury that
 
 
 31
 [t]he law does not require that the Government prove that the defendant conspired to accomplish each object of the conspiracy. You can return a verdict of guilty on the conspiracy count if you find unanimously and beyond a reasonable doubt that the conspiracy existed to commit any of the three objects.
 
 
 32
 That formulation is correct, as the Supreme Court's opinion in Griffin v. United States, 112 S.Ct. 466 (1991), makes clear. The Court reaffirmed the rule set forth in Turner v. United States, 396 U.S. 398 (1970), that " 'when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged.' " Griffin, 112 S.Ct. at 473 (quoting Turner, 396 U.S. at 420). A general verdict will not be set aside "because one of the possible bases of conviction was neither unconstitutional as in Stromberg[ v. California, 283 U.S. 359 (1931) ], nor even illegal as in Yates[ v. United States, 354 U.S. 298 (1957) ], but merely [because it was] unsupported by sufficient evidence." Id. at 472. Court decisions that invalidate general conspiracy verdicts for the legal deficiency of an object rather than inadequacy of proof are here, as in Griffin, "irrelevant." Id. at 473 n. 2. As the government notes, concealment of an alien is a legally sufficient conspiracy object.
 
 
 33
 Finally, there is no requirement (constitutional or otherwise) that a conspiracy verdict be consistent with the verdict on a separate substantive count. United States v. Guzman, 849 F.2d 447, 448 (9th Cir.1988).
 
 
 34
 Therefore, the jury instruction regarding the multiple object conspiracy was not an abuse of the trial judge's discretion.
 
 
 35
 Peral-Cota also complains that the special verdict form confused the jury. This contention is meritless. The judge adequately explained the special verdict form to the jury. The form itself is relatively simple and straightforward.
 
 
 36
 C. Admission of co-conspirator statements.
 
 
 37
 Peral-Cota asserts that the trial judge failed to make a "determin[ation] that sufficient foundation existed to invoke ... Rule 801(d)(2)(E)" regarding the admission of co-conspirator statements, and also failed to give the jury a limiting instruction regarding the proper use of such testimony.
 
 
 38
 Peral-Cota concedes that the district court judge had the power to conditionally admit co-conspirator statements--that is, to admit co-conspirator statements provisionally, subject to later motions to strike if the conspiracy or Peral-Cota's connection to it were not established. United States v. Zemek, 634 F.2d 1159, 1169 (9th Cir.1980), certs. denied, 450 U.S. 916, 450 U.S. 985, 452 U.S. 905 (1981). Peral-Cota did not move to strike or object to lack of foundation at any time during the trial, and there is no contention that the foundation was not ultimately laid.
 
 
 39
 As to the claim that no limiting instruction was given, the trial judge did give an extensive instruction when the government introduced the first co-conspirator statement. Peral-Cota does not dispute the legal accuracy of that instruction. A determination whether to repeat a contemporaneously delivered instruction at some later point in the proceedings is within the trial judge's discretion. United States v. Ashby, 864 F.2d 690, 694 (10th Cir.1988), cert. denied, 494 U.S. 1070 (1990).
 
 
 40
 The trial judge did not err in admitting the co-conspirator statements, and his limiting instruction decision (and its timing) was not an abuse of discretion.
 
 
 41
 D. Cross-examination limitations.
 
 
 42
 Both appellants contend that the trial judge impermissibly restricted cross-examination of the four young men smuggled across the border. The test of whether the trial court has abused its discretion in restricting cross-examination is whether, notwithstanding the limitation, the jury nevertheless has sufficient information to make a discriminating appraisal of the question before it. United States v. Brown, 936 F.2d 1042, 1048-49 (9th Cir.1991).
 
 
 43
 Peral-Cota claims that the link connecting him to the Victor Gomez-Garcia beating is tenuous at best. Citing to the testimony of Gomez-Garcia, Ortega-Estrada, and co-defendant Maria Bonilla-Guillen, Peral-Cota asserts that "[t]he court repeatedly interrupted and curtailed counsel's cross-examination of these witnesses." Our examination of the transcript does not support his contention.
 
 
 44
 Although the trial judge kept a tight grip on the examination of the witnesses on both direct and cross, he did not preclude defense counsel from cross-examining any witness on the question of Peral-Cota's involvement in the beating. That the jury believed Gomez-Garcia over Bonilla-Guillen and Ortega-Estrada (to the extent that their testimony conflicted with Gomez-Garcia's) is, of course, a question of credibility, but its resolution against the defendant does not mean that the jury was not apprised fairly of the conflicting evidence.
 
 
 45
 Barazza-Armenta complains more generally that the trial judge's restrictions on cross-examination did not give the jury a proper feel for the credibility of the four young friends.
 
 
 46
 As the government points out, there was extensive testimony and cross-examination regarding the kidnapping and beating, especially from Gomez-Garcia and Ortega-Estrada. Additionally, two photographs (government exhibits 3 and 3A) of Gomez-Garcia were in evidence. Finally, Barraza-Armenta was not charged with assault (nor were any of the other defendants). The beating is relevant only to the "detaining illegal aliens for ransom" charge; thus, the tangential details of the incident are only marginally relevant. Cross-examination on background and tangential matters "essentially irrelevant" to the defense may be restricted by the district court. Brown, 936 F.2d at 1049.
 
 
 47
 The trial court did not abuse its discretion in limiting cross-examination.
 
 III. Conclusion
 
 48
 For the foregoing reasons, we reject appellants' arguments on appeal, and AFFIRM their convictions.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3